IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,                    Criminal Case No. 09-365-KI

                Plaintiff,

    vs.                                                    OPINION AND ORDER

**JAMES HENRY AVINGTON, JR.**,

                Defendant.

Dwight C. Holton
Interim United States Attorney
District of Oregon
Jane H. Shoemaker
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204

    Attorneys for Plaintiff

Lisa Hay
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204

       Attorney for Defendant

KING, Judge:

Henry James Avington, Jr. has been charged with being a felon in possession of a firearm
in violation of 18 U.S.C. § 922(g)(1).  Before the court is Avington's Motion to Suppress (#14)
in which he moves to suppress all evidence and statements obtained as a result of two
interrogations, one on July 31, 2009 and one on September 28, 2009.  For the following reasons,
I deny the motion.

## BACKGROUND

The facts as adduced at an evidentiary hearing and reflected on the video recording are as
follows:

Officers stopped Avington at 2:25 pm on July 31, 2009, pursuant to a search warrant for
Avington and his vehicle.  Officer Christopher Lindsey handcuffed Avington and transported
him to the police station.  Portland police arrived at Avington's house around 2:40 pm the same
day with a search warrant for the house.  Officers found two firearms in a bedroom dresser
containing men's clothing, including boxers.  Police documented the sizes of the men's clothing
and took photographs of the clothing, including the brand name, but did not seize the clothing.

Officer Chad Gradwahl testified that he called an Assistant United States Attorney
("AUSA") sometime between 2:25 and 5:00 pm and told him that police had found firearms at

Page 2 - OPINION AND ORDER

the house.  The AUSA told Officer Gradwahl that he would "take a look" at the case.  Officer

Gradwahl believed he had authorization to proceed with the gun prosecution federally.

Three hours after he was arrested, around 5:25 pm, Officer Gradwahl questioned

Avington in the precinct's interview room with Officer Lindsey present.  The officers had

concluded the search of Avington's house.  On video, submitted to the Court as Government's

Exhibit 1, Avington read a form outlining his <u>Miranda</u> rights and signed the form indicating he

understood his rights.  He then asked the officers what was going on.  Officer Gradwahl told him

about the search warrant and told him that police officers had bought marijuana from him.

Avington denied selling marijuana.  Officer Gradwahl asked questions about how much

marijuana Avington had in the house and in his car, to confirm that Avington had complied with

the requirements of his medical marijuana card.  Avington answered the questions.  Officer

Gradwahl said something about how officers had found the marijuana grow and it looked "legit."

He explained, however, that while searching, officers found guns in the bedroom.

Avington asked, "Where do we go from here, then?"  Officer Gradwahl explained that

they needed to "talk about this sort of stuff–what the deal is with it."  <u>Id.</u>  Avington asked, "With

what?"  Officer Gradwahl responded, "Well, the selling marijuana."  Avington interrupted Officer

Gradwahl and again denied selling marijuana.  He then said something like, "If I need a lawyer,

that's what I need to do."  Officer Gradwahl responded by saying, "That's fine.  So, you don't

want to talk about any of this stuff?"  Avington shook his head and said, "No."  Officer

Gradwahl then said, " All right.  That sounds good.  Just so you know, the US Attorney's office

is taking your case."  Avington said, "Okay."  Officer Gradwahl said, "Okay.  So the guns will be

federally prosecuted."  Avington said, "Okay."  Officer Gradwahl said, "And we'll go from

there." Avington said, "All right," and Officer Gradwahl said, "All right." Officer Gradwahl testified at the evidentiary hearing that he was letting Avington know what was going to happen.

The officers then put Avington in a holding cell and asked him to take off his clothes. (This portion of the encounter was not recorded.) Officer Gradwahl told Avington he would get a paper suit to wear. Officer Gradwahl testified that the paper suits are stored on a shelf near the holding cell. Avington asked why they needed his clothing. Officer Gradwahl told him they needed it to compare with the clothing in the dresser where the guns were found. Avington immediately said he had the gun to protect his family. Officer Gradwahl told Avington he could not talk about the gun because Avington had already requested a lawyer. When Avington repeated his statement, which suggested to Officer Gradwahl that Avington was wondering what the big deal was with the guns, Officer Gradwahl reiterated that they could not talk with him about the guns and that they would have to go back to the interview room if he wanted to talk. Avington agreed to go back to the interview room.

Two minutes[1] after the initial interrogation had come to a close, and back on video, the officers and Avington returned to the interview room.  Avington said something like he wasn't going to ask any questions.  Officer Gradwahl said he understood and then said, "Just so we're all understanding, earlier you asked for a lawyer, so we stopped the interview.  Back in the holding cell, you said . . . ." Avington interrupted and said, "That's why I asked the question.  I didn't understand."

Officer Gradwahl then reported that Avington had said in the holding cell that he had the gun for protection of his family, and that Avington had changed his mind and was agreeing to

---

[1]Since the recorder was running during this time, I know that two minutes had passed.

talk to the officers about the gun.  Officer Gradwahl drew Avington's attention to the document

from which Avington had previously read his rights, and reminded Avington that he still had

those rights.  Avington confirmed that he wanted to talk to the officers.  Avington confessed to

possessing the firearms in his residence.  Avington did not know if the guns worked and he did

not know it was illegal to have them.  He was surprised to learn that his conviction for coercion

seven years ago was a felony.

Officer Gradwahl testified that the officers determined they no longer needed Avington's

clothes since they had his confession.

Two months later, on September 28, 2009, Avington was interviewed by ATF agents as

he was being transported to federal court for his arraignment.  The ATF agents read Avington his

Miranda rights and Avington acknowledged them.  Avington asked why he was being prosecuted

federally.  Agent Matt Olson told him he thought it was because of Avington's gang affiliations.

Avington said he was not a gang member.  Agent Olson asked, "Why did you have the gun?  For

your own protection?"  Avington said yes.  Agent Olson testified that he was aware of

Avington's earlier statements but that he did not reference those earlier statements and was

simply engaging in a different line of questioning.

**DISCUSSION**

Avington argues that (1) after he invoked his right to counsel, police improperly subjected

him to the functional equivalent of interrogation; (2) even if the coercive tactics did not amount

to interrogation, Avington's waiver of counsel was not voluntary; and (3) Avington's statements

to ATF agents were the fruit of the poisonous tree.

I.      Whether Police Improperly Interrogated Avington After He Invoked His Right to Counsel

Page 5 - OPINION AND ORDER

It is undisputed that Avington invoked his right to counsel. Avington contends that, with that invocation, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police" or there is at least a 14-day break in custodial interrogation. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); Maryland v. Schatzer, 130 S. Ct. 1213, 1223 (2010). The rule is "to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990).

Avington argues that police improperly continued to interrogate him after he invoked his right to counsel by engaging in the "functional equivalent of interrogation." The "functional equivalent of interrogation" is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). In Avington's situation, he argues, when the police mentioned he would be federally prosecuted and when they directed him to undress while he was in the holding cell, the police acted in a way that they knew was reasonably likely to elicit an incriminating response from Avington. See United States v. Foster, 227 F.3d 1096, 1103-1104 (9th Cir. 2000) (indirect comments can constitute interrogation); United States v. Padilla, 387 F.3d 1087, 1093 (9th Cir. 2004) (the statement that it was defendant's "last chance to cooperate" was the functional equivalent of interrogation).

I find that neither Officer Gradwahl's statement that the case would be federally prosecuted, nor his direction to undress because he needed to compare clothing, constitutes the "functional equivalent" of interrogation. The standard is

> quite high.  The fact that [statements made by an officer] may have struck a
> responsive chord, or even that they may have constituted 'subtle compulsion' is
> insufficient to find that they were the functional equivalent of interrogation . . . .
> [T]he police surely cannot be held accountable for the unforeseeable results of
> their words or actions[;] the definition of interrogation can extend only to words
> or actions on the part of police officers that they should have known were
> reasonably likely to elicit an incriminating response.

Foster, 227 F.3d at 1103.

I deal first with Officer Gradwahl's direction to Avington to undress.  Both officers testified that it was not uncommon to require a suspect's clothing for evidentiary purposes.  Furthermore, I find plausible Officer Gradwahl's explanation that he would need to compare Avington's clothing to the clothing in the dresser.  Officer Gradwahl testified credibly that he had pictures of the clothes from the dresser, which depicted the sizes, the label, and the pattern of the boxers, along with documentation of the sizes of the clothing.  Furthermore, the way in which the officers described the conversation convinces me that Avington was not concerned about being naked in front of the officers while he waited for a paper suit; the conversation unfolded too quickly for that to be the issue.  Before the officers could even explain the mechanics of how Avington would undress, such as whether they would take Avington's handcuffs off, Avington started talking almost immediately about the gun he kept to protect his family.  Furthermore, when Avington commented about the guns, Officer Gradwahl reminded him that he had invoked his right to counsel and Officer Gradwahl could not talk with him about it.

As for Officer Gradwahl's statement that Avington would be charged federally with possession of the guns, the statement is somewhat troubling.  However, in reviewing the recording, I find credible Officer Gradwahl's explanation that he was informing Avington what would happen next.  Officer Gradwahl makes the statement casually and not in a retaliatory way.

Page 7 - OPINION AND ORDER

It is a true statement, as he had spoken with an AUSA earlier and Officer Gradwahl believed he

had authorization to prosecute the case federally.  As reflected in the recording, the statement had

no effect on Avington; he simply said "Okay" in response to the information.  Additionally,

although defense counsel argues that the case was first brought in state court, Officer Gradwahl

explained that all of his cases are handled that way and that the federal prosecutor adopts the

case.  Additionally, this was the first time Officer Gradwahl told Avington what the charges

were.  He had explained earlier in the conversation that the marijuana grow looked legal, but he

had not explained to Avington the significance of finding the guns in Avington's bedroom.

Furthermore, when Avington began talking about the guns while in the holding cell, Officer

Gradwahl reminded Avington that he had invoked his right to counsel.

      I conclude that the officers did not engage in the functional equivalent of interrogation.

Rather, Avington himself re-initiated further conversation with the officers after he had invoked

his right to counsel.  As a result, the officers did not violate Edwards.

II.      Whether Avington Voluntarily Waived His Right to Counsel

      Even if the actions by the police did not constitute interrogation, Avington argues his

waiver of the right to counsel was involuntary.

      The government must establish the voluntariness of petitioner's statements by a

preponderance of the evidence.  United States v. Kelley, 953 F.2d 562, 564 (9th Cir. 1992).

When considering whether statements are voluntary, a court must consider the totality of the

circumstances, including the characteristics of the accused and the details of the interrogation.

Id.  A statement is "involuntary only if the police use coercive means to undermine the suspect's

ability to exercise his free will."  Henry v. Kernan, 197 F.3d 1021, 1026 (9th Cir. 1999).

Page 8 - OPINION AND ORDER

> The test of voluntariness is well established:  "Is the confession the product of an essentially free and unconstrained choice by its maker? . . . The line of distinction is that at which governing self-direction is lost *and compulsion, of whatever nature or however infused*, propels or helps to propel the confession."

Id. at 1026-27 (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961) (alteration in the original)).

Overreaching includes lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion.  Kelley, 953 F.2d at 565.  When there is alleged psychological coercion, the issue is "whether the defendant's will was overborne" when he confessed.  United States v. Miller, 984 F.2d 1028, 1031 (9th Cir. 1993).  Deception does not render a confession involuntary.  Id.

Avington argues he was coerced into waiving his right to counsel.  Officers took him to a holding cell and ordered him to undress.  They told him they would give him a paper gown, but did not hand him one.  Officers did not explain why they could not simply look at Avington's clothing or take photographs of the clothing.  Furthermore, officers never actually pursued this line of investigation–they never followed up and compared the clothing once Avington talked.  Avington suggests the officers asked him to undress as a ruse in order to get him to talk.  Additionally, Avington suggests being ordered to undress by authority figures, such as the police, is incredibly degrading and scary.  See Bram v. United States, 168 U.S. 532, 563-64 (1897) (confession during stripping, considering other additional factors, was involuntary); Thompson v. City of Los Angeles, 885 F.2d 1439, 1446 (9th Cir. 1989) (strip searches cause "feelings of humiliation and degradation"); Chapman v. Nichols, 989 F.2d 393, 396 (10th Cir. 1993)

("disrobing and exposing one's self for visual inspection by a stranger" is "thoroughly degrading and frightening").

I find that the government has proven by a preponderance of the evidence that Avington's statements were voluntary.  Looking at the totality of the circumstances, the officers' actions were not threatening, intimidating, improperly influential or psychologically coercive.  Colorado v. Spring, 479 U.S. 564, 573 (1987); Beatty v. Schiro, 509 F.3d 994, 999 (9th Cir. 2007).  Although, as I commented above, Officer Gradwahl's comment that the case would be prosecuted federally is somewhat troubling, in the end I believe he was providing information to Avington.  Furthermore, until Avington confessed, the police needed his clothing to prove the possession element of the offense.  Avington began talking about guns immediately after Officer Gradwahl explained the officers' need for Avington's clothing.  The officers correctly reminded him not to talk since he had asked for a lawyer.  When he continued to talk, they walked him back to the interview room where they reminded him of his rights.  The situation is more closely analogous to that described in United States v. Pheaster, 544 F.2d 353, 366 (9th Cir.1976), where the court stressed the "key distinction between questioning the suspect and presenting the evidence available against him."  Avington's statements were voluntary.

III.     Whether Avington's Statements were the Fruit of the Poisonous Tree

Finally, Avington argues the statements he made to the ATF agents should be suppressed as fruits of the poisonous tree.  Fruit of the poisonous tree is evidence which "has been come at by exploitation of [the primary] illegality," not evidence obtained "by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun v. United States, 371 U.S. 471, 488 (1963).  Avington contends the ATF agents repeated his earlier statement–that he had the

Page 10 - OPINION AND ORDER

gun "for protection"–to encourage him to repeat his inculpatory statements.  It is the government's burden to show the evidence is not the fruit of the poisonous tree.  United States v. Johns, 891 F.2d 243, 245 (9th Cir. 1989).

I found above that Avington's initial confession was voluntary, so the statements he made to the ATF agents are not fruit of the poisonous tree.  In any event, this interview occurred two months after the initial interview.  The ATF agents gave Avington his Miranda warnings again before they interviewed him.  Finally, Agent Olson testified that he did not refer to Avington's earlier statements but followed a different line of questioning about Avington's alleged gang affiliations.  These statements will not be suppressed.

IV.    The Effect of Avington's Arrest

At the end of defendant's argument, defense counsel argued that an alternative reason to suppress these statements was the fact that police unlawfully arrested Avington.  Neither party briefed this argument in their initial memoranda and defendant did not elucidate the argument in his supplemental memoranda which he requested permission to file.

In a footnote in the government's response to defendant's supplemental memorandum, the government reports that police had probable cause to arrest defendant for distributing marijuana because defendant had sold marijuana to a police informant.  Based on the limited record before me on this issue, I conclude officers had probable cause to arrest Avington.  See Beck v. State of Ohio, 379 U.S. 89, 91 (1964) (probable cause is established if, when the arrest is made, the officer had knowledge of facts and circumstances based on reasonably trustworthy information sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense).

Page 11 - OPINION AND ORDER

## CONCLUSION

For the foregoing reasons, I deny defendant's Motion to Suppress (#14).

IT IS SO ORDERED.

Dated this _____28th_____ day of April, 2010.


        _/s/ Garr M. King_____
        Garr M. King
        United States District Judge